**SIGNED THIS: March 30, 2016**

_(signature)_

_____

**Mary P. Gorman**
**United States Chief Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 13-72140 |
| KYLE A. NAVE and | ) | |
| AMANDA M. NAVE, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | |

---
# **O P I N I O N**
---

The Trustee's Final Report filed by Jeana K. Reinbold ("Trustee") is before

the Court for approval. Although this Court generally approves final reports after

notice but without an actual hearing in the absence of objection, the final report

here cannot be approved under that routine practice. The final report raises

questions involving the Trustee's sale of estate property at a loss, and her charging

the estate for expenses that should be included in overhead and for expenses that

were estimated but not actually incurred. Although the final report discloses serious problems in the administration of the estate, requiring the Trustee to file an amended final report would result in delay and additional charges against the estate. Accordingly, this Court will reluctantly approve the pending final report with only minor changes in the proposed distribution required. But the Trustee is admonished that she must conform her estate administration practices to the requirements of the Code, Rules, and controlling case law if she expects her final reports to be approved in the future.

## I. Factual and Procedural Background

Kyle A. Nave and Amanda M. Nave ("Debtors") filed their voluntary petition under Chapter 7 on November 11, 2013. Kyle Nave disclosed on the Statement of Financial Affairs ("SOFA") that he had operated an electrical contracting business, Nave Electric, Inc., until January 2013. The United States Trustee ("UST")became involved early in the case asking that the Debtors be ordered to appear at a Rule 2004 examination and seeking an extension of time in which to object to the Debtors' discharge.

Subsequently, the UST timely filed an objection to the discharge of Kyle Nave alleging that he had failed to comply with court orders requiring the production of documents, had failed to disclose pre-petition transfers of real estate to his mother, a motorcycle to his brother, and firearms to multiple purchasers on his SOFA, and had failed to disclose ownership of a shotgun, a bank account, a baseball card collection, a parcel of real estate, and an archery bow on his schedules. In an amended complaint, the UST added allegations that Kyle Nave

had testified falsely at his first meeting of creditors regarding the income he had received from Nave Electric and certain payments he made to his parents in 2013. After trial on the UST's amended complaint, Kyle Nave's discharge was denied. *See Gargula v. Nave (In re Nave)*, 2015 WL 3961768 (Bankr. C.D. Ill. June 29, 2015).

While the UST was pursuing the denial of Kyle Nave's discharge, the Trustee began administering the Debtors' non-exempt assets. In mid-February 2014, the Trustee moved to hire an auctioneer to appraise the Debtors' real and personal property and to sell property if "appropriate." In late March, the Trustee also filed an adversary complaint against First National Bank in Taylorville ("First National Bank"), Nathan A. Murray, Dennis J. Finley, and Brandon J. Finley. In the complaint, she alleged that the Finleys had sold Kyle Nave a 1996 Astro boat and trailer in June 2012, and that they had been fully paid and had no continuing interest in the boat and trailer. She also alleged that Nathan Murray sold a 2006 Ranger boat and trailer to Kyle Nave in August 2012, and that Mr. Murray was fully paid and retained no interest in the boat or trailer he sold. The Trustee asserted that First National Bank had lent money to Kyle Nave to acquire both the Astro boat and the Ranger boat but had failed to comply with Illinois law regarding the perfection of liens on untitled watercraft. She requested that the lien of First National Bank on both boats be avoided due to the lack of perfection.

The Finleys and Nathan Murray entered into stipulations with the Trustee confirming that they had no interest in the boats and trailers they sold to Kyle Nave. Likewise, First National Bank stipulated with the Trustee that it had not perfected its lien on either boat. Based on the stipulations, judgments were

entered in favor of the Trustee and against the individual defendants in May 2014 and against First National Bank in July 2014.

On August 29, 2014, the Trustee filed three separate motions seeking authority to sell the Astro boat and trailer, the Ranger boat and trailer, and personal property including a Ruger gun, a gun safe and supplies, an archery bow and supplies, a Suzuki four-wheeler, a Yamaha dirt bike, and fishing poles and equipment. In related notices of intent to sell filed contemporaneously with the motions, the Trustee gave notice of her intent to sell the Astro boat and trailer to Ryan Nave, the brother of Kyle Nave, for $3000 and of her intent to sell the Ranger boat and trailer and the personal property at an auction scheduled for October 16, 2014. With respect to the Ranger boat and trailer, the notice disclosed a minimum reserve price of $12,000.

On the same day that she filed her motions to sell, the Trustee filed a motion for turnover asking that the Debtors be ordered to turn over the Ranger boat and trailer, the Astro boat and trailer, and the items of personal property listed in her sale motion and notice. With respect to the boats and trailers, the Trustee also requested the turnover of keys, titles, and registration documents. Additionally, the Trustee requested the turnover of $1196 in non-exempt funds held in the Debtors' checking account on the date of filing and $804 which she claimed was owed to Kyle Nave by his employer. Finally, the Trustee alleged that her auctioneer had appraised the Debtors' household goods and furnishings as having a value of $13,310 and asserted that because of that value, the Debtors had no excess wild card exemption to use on any of the items she had requested

be turned over.

At a hearing on her motion for turnover held on September 9, 2014, the Trustee acknowledged that although her appraiser had inspected the Debtors' property in January, she had not taken possession of the items she intended to sell. She asserted that the Astro boat and trailer and a number of the other items of personal property were not initially disclosed on the Debtors' schedules. The Trustee discovered the items either because they were disclosed by the Debtors in first meeting testimony or through inspection of the Debtors' home. The Trustee complained that she had provided the Debtors with a copy of her appraisal in April but the Debtors had not amended their schedules or made an offer to purchase the assets from the estate.

The Debtors appeared by new counsel, having discharged the attorney who had filed the petition for them. Their new attorney admitted that the original schedules were inadequate and needed to be amended. He claimed that the Debtors disputed the values placed on some items by the Trustee's appraiser. He stated that although the Debtors had agreed to turn over the boats and trailers, they were not in agreement to turn over the other personal property. He also claimed that the Suzuki four-wheeler and the Yamaha dirt bike belonged to the Debtors' children. When questioned, however, he admitted that he did not know how old the children were nor had he seen any documents that supported the claim that they owned the items.

After hearing the arguments, this Court ordered the Debtors to immediately turn over to the Trustee the boats and trailers and all of the other items of

personal property described in the Trustee's motion. The Debtors had not amended their schedules to claim any of the items as fully exempt, and their disputes as to the value of non-exempt items presented no defense to the turnover request. The Court also expressed concern about the significant delay that had occurred in the case and admonished both parties that they each bore responsibility for the delay. The Trustee had a duty to take possession of estate property and the Debtors had a duty to turn over that property to the Trustee. Both the Trustee and the Debtors had exposed themselves to the risk of loss when, ten months after the case was filed, non-exempt assets were still in the possession of the Debtors. Because the parties were still exchanging documents regarding the Trustee's request for turnover of funds from the bank account and paycheck, ruling on that part of the motion was reserved for further hearing on September 30, 2014.

At the continued hearing on the remainder of the motion for turnover, the Trustee admitted that she had only a bank statement for the month prior to the Debtors' filing and was relying on pre-petition pay advices for her claim against the Debtors. The Debtors' attorney acknowledged that he had not obtained the necessary documents from his clients to establish either the date-of-filing bank balance or the status of the pay allegedly due to Kyle Nave. The Court again admonished the parties about the delays in the case and expressed concern that no progress had been made on the issues. The motion was continued until October 2, 2014—just two days later—with express direction to the parties to obtain and exchange the needed documents and to talk about the issues.

Before the hearing concluded, the Trustee reported that the Debtors had not fully complied with the Court's turnover order. She stated that the Debtors had turned over everything but the fishing poles and related equipment. She claimed that the fishing equipment was appraised at over $2000. The Debtors' attorney acknowledged that his clients had not turned over the fishing poles and equipment but asserted that the poles belonged to the Debtors' children. The Court reminded the Debtors' attorney that the turnover order was final and admonished him that the repeated claims by the Debtors at this late stage in the case that assets subject to the order belonged to their children was not helpful to his clients' position. The Court also noted that the Debtors had filed several new claims of exemption to which the Trustee had objected. Those matters were also set for hearing on October 2nd.

At the continued hearing, the parties reported that they had reached a global settlement that included agreement on the amounts to be turned over from the bank account, the paycheck received post-petition, and a tax refund. They also had resolved all issues regarding the Debtors' turnover of assets and claims of exemption. Subsequently, an agreed order was submitted that provided for the Debtors to pay the Trustee $5810 pursuant to an agreed schedule, compelled Kyle Nave to offer the highest bid for certain items of personal property at the Trustee's auction, and required the filing of an Amended Schedule C by the Debtors.

Despite the Debtors' objections to the motion for turnover, they did not file objections to the Trustee's sale motions. Accordingly, orders were entered allowing the sales to proceed as proposed by the Trustee.

On November 20, 2014, the Trustee filed a report of sale with respect to the Astro boat and trailer. She reported that the boat and trailer had been sold to Ryan Nave for $3000 and, from that sum, $600 had been paid to First National Bank to release its lien on the trailer. On the same day, she filed a report of sale with respect to the Ranger boat and trailer disclosing that the boat and trailer had been sold at auction for $12,200 to Justin Nave. She also reported that $3500 had been paid to First National Bank to release its lien on the trailer. The Trustee requested approval of auctioneer's compensation for selling the Ranger boat and trailer at the rate of 7.5% even though the auctioneer had been employed at a 15% rate. She asked for authority to pay the auctioneer a $915 commission plus $435 in expenses. The Trustee also filed a report of sale with respect to the personal property. She reported that certain items had been sold to Kyle Nave for $3325. With respect to the personal property, she requested approval of a 15% commission, or $498.75, plus expenses of $350 for her auctioneer. After the compensation requests for the auctioneer were noticed and no timely objections were received, the auctioneer's compensation was approved.

Immediately after filing the reports of sale, the Trustee filed a document captioned as a Motion to Allow and Pay Claim ("Motion to Pay"). In the Motion to Pay, she disclosed that, after filing her motion to sell the Ranger boat but before the sale occurred, she learned that, on December 10, 2013, Kyle Nave had requested service on the boat from Sixteen Marine of Shelbyville, Illinois. According to the Trustee, the Ranger boat had been at Sixteen Marine from December 2013 until October 16, 2014, when the Trustee's auctioneer went to

– 8 –

pick it up. The Trustee said in the Motion to Pay that Sixteen Marine was owed
$6559.42 for parts and labor but had agreed to accept the reduced amount of
$6092.42, which she requested authority to pay as an administrative expense
claim. She acknowledged that the Debtor had no authority to incur the charges
with Sixteen Marine but also asserted that the Ranger boat was only made
operational by the services provided by Sixteen Marine and that payment of the
reduced bill by the estate was justified. After creditors and parties in interest were
given an opportunity to be heard and no objections were filed, the Motion to Pay
was allowed.

On October 21, 2015, the Trustee filed her Final Report and Proposed
Distribution ("Final Report"). Shortly thereafter, she filed a Notice of Trustee's
Final Report and Application for Compensation. The Final Report disclosed that
the Trustee had collected $21,010 from sales and payments from the Debtors and
had expended $12,794.57 in disbursements to secured creditors, costs of sale,
and other expenses. The Trustee proposed a payment to herself of $2851 for her
commission and $219.44 for her expenses. The remaining balance of $5144.99
was proposed to be distributed to the Internal Revenue Service ("IRS") on its
priority claim of $319,520.42. No distribution was proposed for the more than $1
million in allowed unsecured claims on file. The Trustee served the Notice of Final
Report and Application for Compensation on all creditors and parties in interest
and provided them until November 13, 2015, to object to her proposed
distribution and requested compensation. No objections were filed.

Upon reviewing the Final Report and other documents before signing the

Trustee's proposed order approving the distribution and her compensation, the Court discovered that the sale of the Ranger boat and trailer appeared to have been at a loss and that a number of inadequately itemized expenses were claimed by the Trustee. An order was entered notifying the Trustee that additional information was needed and specifically requesting a complete accounting of the sale of the Ranger boat and trailer including an allocation of costs to the sale. The order also requested a more detailed itemization of the costs claimed by the Trustee, noting that many of the costs for postage and mailing were charged without any reference to a particular motion or notice. The Trustee was asked to provide authority for the proposition that she should be paid her full commission on the distribution of proceeds from assets sold at a loss. She was also asked to provide authority for charging the estate not only for significant mailing and copying projects but, apparently, for every piece of paper and stamp used in the case. The order requested a written response but also stated that the Trustee should request a hearing if she believed that one would be helpful.

The Trustee filed a response in which she itemized the Ranger boat sale by deducting the payments to First National Bank and Sixteen Marine, the previously approved compensation for the auctioneer, and an anticipated 10% commission to herself. She declined to allocate any of the costs incurred in the administration of the case to the sale and claimed that the sale benefitted the estate in the amount of $35.58. She also claimed that, because she does not maintain an office outside of her home, she has no overhead and therefore all of her expenses should be allowed. She cited several cases discussing the distinction between overhead

expenses and case-specific expenses. The Trustee also provided a more detailed itemization of her expense claim, stating that the detail had been inadvertently omitted from her original filing. She also asked that a hearing be set to allow her to more fully present information regarding her administration of the estate.

At the hearing held on December 15, 2015, the Trustee began her presentation by noting how uncooperative the Debtors had been and by reminding the Court that Kyle Nave had been denied a discharge. She stated that she had put a lot of work into the case which included making multiple trips to secure property and dealing with the Debtors' repeated amendments to their claim of exemptions. She said that when the Ranger boat and trailer had initially been appraised by her auctioneer, they had been valued at between $17,500 and $18,000, and a firm offer to purchase the Ranger boat and trailer in the amount of $15,000 had been received in March 2014. Based on that information, the Trustee asserted that she had no reason to think that selling the Ranger boat and trailer in October 2014 would not bring meaningful proceeds into the estate. She said that she learned about the claim of Sixteen Marine only after she had noticed the sale and that she spent considerable time negotiating with the Debtors' attorney trying to get the Debtors to pay Sixteen Marine. She believed, however, that even if the estate had to pay Sixteen Marine, the sale would still be meaningful, and she went ahead with the sale on that basis. She admitted that the original reserve of $12,000 set for the sale was not adjusted when she learned of Sixteen Marine's claim.

The Trustee declined to allocate any of the expenses she was claiming for

postage and mailing to the sale, arguing that it was difficult to know how to make such an allocation. She asserted that if she had to make an allocation, the proper way to allocate would be to prorate the expenses based on the net proceeds received from each sale. She also suggested that because the net proceeds from the Astro boat sale were larger that the $35 net from the Ranger boat sale, it would be appropriate to allocate all sale costs to the Astro boat sale. The Trustee cited no authority for her suggested allocation methodology.

The Trustee stated that, notwithstanding her claimed inability to allocate her expenses to any particular sale or activity, all of the expenses were properly chargeable to the estate. She confirmed her belief that in an asset case, it is proper for a trustee to charge for every sheet of paper used and acknowledged that, in this case, she charged not just for copies but also for any paper used for original letters. To clarify, the Court inquired whether, if the Trustee's auctioneer had requested reimbursement for several sheets of paper used to write down the bids at the auction, the Trustee would believe that to be a proper charge. The Trustee answered affirmatively, stating that she would pay such charges without question. When the Court asked whether there was any authority for trustees, auctioneers, and other professionals to claim that basic office supplies are not overhead, the Trustee said that she had not researched the issue and asked for more time to brief the issue. Before the hearing concluded, Assistant UST Timothy Ruppel commented that the UST is concerned about meaningful distributions and encourages trustees to sell only when the proceeds will result in a dividend to creditors. But he also stated that he believed the Trustee had exercised her

business judgment "as well as it could be" exercised. Mr. Ruppel also mentioned how difficult the Debtors had been, although in response to a question from the Court, he acknowledged that the wrongful conduct of Kyle Nave provided no justification for selling estate property at a loss.

In January 2016, the Trustee filed a supplemental brief wherein she recited the same facts she had previously presented regarding the sale of the Ranger boat and trailer. She added that she did not receive the anticipated value of the items at the sale "due to problems with the sale" but she did not elaborate about what those problems were. The Trustee cited several additional cases on allowable expenses and argued that all of her expenses were actually incurred and necessary to the administration of the case. She admitted, however, that she had estimated the cost of copying and mailing her notice of final report at $93.87 but the actual cost was only $51.24. She suggested that the overcharge of $42.63 be disallowed.

Because the Court was reviewing the Trustee's expense reimbursement requests in this case, approval of final reports in two other cases with similar issues were held. At a brief hearing on February 9, 2016, to place those final reports under advisement, the Trustee acknowledged that in one of the cases, the cost of copying and mailing the final report had also been estimated but was actually lower.[1] She stated that the UST had authorized the Chapter 7 trustees to

---

[1] The case are: *Carol R. Dirks*, #13-71841, and *Dena Carol Moyer*, #14-72130. In the *Moyer* case, the Trustee charged $19 for her copy costs related to noticing her final report but actually paid $5.32 to the Bankruptcy Noticing Center ("BNC") for the copies.

estimate on their final reports the cost of mailing their bank statements to the UST and the cost of the pre-paid return envelope they are apparently required to provide for the UST's use in sending the bank statements back to the trustees. The Trustee stated that she estimated the costs of noticing the final report based on doing the work herself but then actually used the BNC, which provides copying and mailing services at a reduced cost. She admitted that she generally uses the BNC for larger mailings and that she could have made the decision of whether to use the BNC before completing her final report and expense claim. She acknowledged that the BNC will provide a firm quote for a particular mailing in advance and therefore she is able to obtain the exact cost of copying and mailing before a final report is completed. She admitted that in cases where she has estimated doing the mailing herself but then used the BNC, she has not adjusted the dividend to creditors but has simply paid herself the higher, originally estimated amount and, thereby, pocketed the difference. She said that occasionally the opposite situation occurs where she includes the lower BNC cost for a mailing in her final report but then does the mailing herself at a higher cost. Her belief is that it all averages out in the end. The Trustee asked for the Court's guidance on whether her practice of estimating her noticing costs is acceptable.

## II. Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; 28 U.S.C. §157(a). All of the issues before the Court are matters concerning the

administration of the estate and are core proceedings. 28 U.S.C. §157(b)(2)(A). The matters also arise from the bankruptcy itself and under the Bankruptcy Code and therefore may be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall,* 131 S. Ct. 2594, 2618 (2011).

### III. Legal Analysis

*A. The sale of the Ranger boat and trailer was made at a loss to the estate.*

Notwithstanding the Trustee's protestations to the contrary, it is clear that the Ranger boat and trailer were sold at a loss to the estate. The sale price for the Ranger boat and trailer was $12,200 and from that amount the Trustee agrees that $3500 paid to First National Bank, $1350 paid to her auctioneer, $6094.42 paid to Sixteen Marine, and $1220 she claims as a commission are properly deducted as costs directly related to the sale. The Trustee asserts that because her calculations result in $35.58 being left after those deductions, the sale provided a benefit to the estate. But the Trustee ignores the obligations she had when she made the sale and the costs of administering the estate that were incurred due to the sale.

When the Ranger boat and trailer were sold, the Trustee had agreed to pay her auctioneer a 15% commission, which would have been $1830 on the $12,200 sale. Also, according to her Motion to Pay, she had learned a few days before the sale that Sixteen Marine was claiming $6559.42 for the work it did on the boat. Although the auctioneer ultimately reduced his commission to $915 and Sixteen Marine settled for $6094.42, the Trustee was obviously about $1400 short of break-even when she made the sale. The Trustee presented nothing to suggest

that when she accepted the $12,200 bid for the Ranger boat and trailer, she had

any belief that, after an allocation of administrative costs, the sale would break

even, much less yield a dividend for creditors.

Notwithstanding the Court's request for the Trustee to allocate

administrative costs to the Ranger boat sale where appropriate, the Trustee did

not address the issue in her written response. She stated at the December 15th

hearing that making the allocation would be difficult but then suggested that the

best way to allocate the expenses would be to prorate all expenses based on the

net proceeds available after the deduction of other costs. Under this methodology,

the Trustee asserted that because only $35 was left from the Ranger boat and

trailer sale, a very small fraction of the costs would be allocated to that sale, and

she claimed that she would then still show a positive result from the sale. The

Trustee cited no authority for her proposed allocation methodology and suggested

no justification for charging expenses to a particular sale or collection solely

because of available proceeds from that sale or collection to pay the expense. A

more accurate methodology would be to look at each claimed expense, determine

whether the expense related in whole or part to the Ranger boat sale, and then

allocate the expense accordingly.

One expense incurred by the Trustee was the $293 filing fee for her

adversary proceeding to clear title to both the Ranger and Astro boats. The

Trustee's time records submitted in support of her compensation request disclose

that, before filing her complaint, she consulted with the attorney for First National

Bank regarding whether it had a perfected security interest in the boats. The time

records do not show that the Trustee made any contact with or demand on the individual defendants prior to filing the action. The time records do disclose, however, that within days of being served, all of the individual defendants contacted the Trustee and agreed to stipulate that they had no interest in the boats. If none of the individual defendants was actually asserting a claim against the boats and First National Bank was willing to concede that its liens were unperfected, it is not clear why the adversary complaint was filed in the first place. Further, it seems likely that if the only boat for sale was the Astro boat valued at $3000, the Trustee would have made more of an effort to resolve the title issues without spending a filing fee of almost ten percent of the boat's value. And if there was some resistance by First National Bank to agreeing that its liens were not perfected, and the Trustee was therefore required to file the complaint, the filing fee could have and should have been collected from First National Bank. It appears that the adversary proceeding was filed because the Trustee was expecting significant proceeds from the Ranger boat and trailer sale and therefore did not feel compelled to be as cost conscious as she would have been if she had only the Astro boat and trailer to sell. The filing fee of $293 can easily be allocated to the Ranger sale as it appears doubtful the cost would have been incurred by the estate but for that sale.

A number of the Trustee's claimed expenses for copying and mailing costs also relate to the Ranger boat and trailer sale. All the expenses related to noticing the auctioneer's compensation request and seeking authority to pay Sixteen Marine are chargeable to the Ranger sale. Likewise, the costs associated with

-17-

mailing the stipulations to clear title to the Ranger boat may be charged to that sale. The costs for noticing the sale motions should be split in thirds, and the costs for serving the adversary complaint and processing the titles after the sales should be split with the Astro boat sale. The Trustee also charged for a number of other small mailing and copying expenses directly related to the Ranger boat and trailer sale. All of these costs add up to over $35. Further, it appears that during the two months that the proceeds of the Ranger sale were in the Trustee's bank account, her bank service charges increased by approximately $9 per month adding more, albeit small, costs properly chargeable to that sale.

The Trustee's assertion that the sale of the Ranger boat and trailer yielded a positive result for the estate is simply wrong. Of equal concern, however, is the Trustee's claim that the problems in her administration of estate property, if any, were all caused by the Debtors. The Trustee made several serious errors in judgment that were the principal cause of the unfortunate results here.

Chapter 7 trustees have a duty to "collect and reduce to money the property of the estate" and they are "accountable for all property received[.]" 11 U.S.C. §704(a)(1),(2). Trustees are encouraged to move their cases along and admonished to bring cases to a close "expeditiously." 11 U.S.C. §704(a)(1). "A chapter 7 trustee is a fiduciary of the estate whose principal duty is to administer estate property so as to maximize distribution to unsecured creditors, whether priority or general unsecured." *In re All Island Truck Leasing Corp.*, No. 8-09-77670-REG, 2016 WL 821174, at *7 (Bankr. E.D.N.Y. Mar. 2, 2016) (collecting cases). "Prior to administering an asset of the estate, a trustee must determine that doing so will

-18-

fulfill the aforementioned duty–a trustee must prospectively analyze whether an asset will provide a net benefit, after payment of necessary secured claims and costs of administration, that will be distributable to unsecured creditors." *Id.* (citations omitted).

The Handbook for Chapter 7 Trustees, published by the Executive Office for United States Trustees, offers unambiguous guidance for how trustees should fulfill these duties. U.S. Dep't of Justice, Executive Office for U.S. Trustees, Handbook for Chapter 7 Trustees (October, 1, 2012)(hereinafter "Trustee Handbook"), www.justice.gov/ust/file/handbook_for_chapter_7_trustees.pdf/download (last visited March 30, 2016). "Generally, a trustee should not sell property subject to a security interest unless the sale generates funds for the benefit of unsecured creditors." Trustee Handbook at p. 4-16. "A trustee may sell assets only if the sale will result in a meaningful distribution to creditors. . . . If the sale will not result in a meaningful distribution to creditors, the trustee must abandon the asset." Trustee Handbook at p. 4-14. The unfortunate results here were caused in large measure by the Trustee's failure to follow this important guidance regarding her duties.

The Debtors scheduled their ownership of the Ranger boat and trailer when they filed their case in November 2013. The Trustee has said that the Ranger boat and trailer were at Sixteen Marine from December 2013 until October 2014 and that her auctioneer inspected all of the Debtors' property, which presumably included the Ranger boat and trailer, in January 2014. Her time records make

-19-

reference to emails from her auctioneer regarding "boat at Shelbyville marina" on February 26, 2014. Thus, by early 2014, the Trustee knew that the Ranger boat and trailer were in the possession of a third party and that the third party was a marina. Learning that the boat and trailer were at a facility that repairs boats was more than sufficient to put the Trustee on notice that the Ranger boat might have had some repairs done to it for which charges could be due and that she should inquire further. And even if the Trustee assumed that the Ranger boat was simply being stored by Sixteen Marine, she still had a duty to inquire about what storage charges had accrued and what additional charges might be incurred if the boat and trailer remained at the marina pending sale.

The Trustee says that she only learned of Sixteen Marine's claim a few days before the sale. Although Kyle Nave was clearly at fault for ordering work on the boat after filing this case, nothing about his wrongful conduct caused the Trustee to ignore the potential claim of Sixteen Marine for at least six months after she was put on notice that it had possession of the Ranger boat and trailer. The problems caused by learning about the claim at the last minute were of the Trustee's own making and the result of her own poor judgment in not initiating a timely inquiry.

The Trustee also apparently failed to take into consideration the seasonality of boat sales, and that error in judgment was another cause of the problems here. The Trustee says that her auctioneer valued the Ranger boat and trailer at $17,500 to $18,000 after a January 2014 inspection and that she had a firm offer of $15,000 in March 2014. She asserts that based on that information she had a

reasonable belief that she would receive a significant bid for the boat and trailer at the auction she scheduled in October 2014. But in Illinois the recreational boating season is generally limited to the summer months, and what a buyer will pay in March for a boat in anticipation of upcoming use would most certainly be higher than what the same buyer would pay in October when all that could be done with the boat is storage. The Trustee exercised no hurry or hustle to move the boat sale along so that it could occur in peak season, and she should not have been surprised when her later, off-peak sale brought less than she expected.

The Trustee also made an error in judgment by failing to adjust the reserve price for the Ranger boat and trailer once she learned of Sixteen Marine's claim. Although potential purchasers might well have been annoyed by a last minute change in the advertised sale terms, the auctioneer could certainly have explained that in order to satisfy all liens and pass clear title, a higher minimum was required. Kyle Nave and his family members who came to bid could not have complained as it was Kyle Nave's fault that the additional expense was incurred. It is, of course, unknown whether the ultimate buyer would have paid a higher price. But the Trustee says that she was expecting a bid in the $17,500 to $18,000 range so her failure to raise the reserve is surprising. And contrary to the argument of the UST, her acceptance of the bid of $12,200 knowing that it would yield nothing for creditors and might well result in a loss to the estate cannot be characterized as an exercise of good business judgment. In the absence of any other justification, proceeding with the sale and accepting the $12,200 bid can only be seen as an attempt by the Trustee to salvage fees and costs for her

auctioneer and herself. There can be no dispute; the Ranger boat and trailer were sold at a loss and without any benefit to this estate.

### B. The Trustee is not entitled to be reimbursed for expenses that are included in overhead or are for estimated rather than actual amounts.

When she filed her request for compensation with the Final Report, the Trustee sought reimbursement for $219.44 in expenses, which were identified generally as copying and mailing costs. The Trustee was requested to provide a more detailed itemization of her costs and to provide authority for the allowance of the cost of mailing individual letters and the cost of individual pieces of paper and stamps. In response, the Trustee filed an itemization clarifying for each expense the document that was copied or mailed. She also filed a short response defending her claim that all of her expenses were properly charged to the estate.

Relying on *In re Leonard Jed Co.*, 103 B.R. 706, 711(Bankr. D. Md. 1989), the Trustee asserted in her response that reimbursement is appropriate for out-of-pocket expenses that can be clearly traced to a particular case. At the December 15th hearing, however, when the Court pointed out that the *Leonard Jed* court had disallowed all postage expenses finding postage to be overhead, the Trustee said that she was relying only on the general definitions set forth in the case and not the practical application of those principles explained in the case.[2] She also asked for more time to fully brief the issue.

---

[2] The *Leonard Jed* court reconsidered the decision cited by the Trustee and in a later decision affirmed that "normal postage" was part of overhead but agreed that the "heavy mailing" of notices could be reimbursed. *In re Leonard Jed,* 118 B.R. 339, 342 (Bankr. D. Md. 1990).

-22-

In her supplemental brief, the Trustee cited this Court's decision in *In re Vancil Contracting, Inc.*, 2008 WL 207533 (Bankr. C.D. Ill. Jan. 25, 2008). *Vancil* held that overhead expenses that are generally not reimbursable include "routine photocopying, incidental postage (including overnight mailing), use of a fax machine, law office software, secretarial services, and general office supplies." *Id.* at *6. Reimbursable expenses include "actual copy and postage expenses where a significant task relating to the representation of the client (e.g., the copying and mailing of a Chapter 11 plan, disclosure statement, and ballots to a number of creditors) is involved." *Id.* at *7. Although the example cited in *Vancil* for allowable costs related to Chapter 11 practice, this Court routinely allows reimbursement to Chapter 7 trustees for significant copying and mailing expenses associated with sending notices of intent to sell, applications for compensation, requests for the approval of final reports, and the like.

The Trustee does not argue that *Vancil* does not control here. Rather, she suggests that the cases relied on in *Vancil* do not actually support the *Vancil* holding. She argues that *In re Convent Guardian Corp.*, 103 B.R. 937 (Bankr. N.D. Ill. 1989) disallowed certain expenses solely on the basis that the expenses were insufficiently detailed. It is true that *Convent Guardian* discusses at length the need for proper itemization and detail for expense reimbursement claims. *Id.* at 941-49. But *Convent Guardian* also holds that "absent extraordinary circumstances, . . . postage charges . . . are overhead and thus noncompensable." *Id.* at 940. *Convent Guardian* was properly cited in *Vancil* and clearly supports the *Vancil* holding. More importantly, *Convent Guardian* provides no support

–23–

whatsoever for the Trustee's claim that routine postage and office supplies are not overhead.

Likewise, the Trustee says that *In re Palladino*, 267 B.R. 825 (Bankr. N.D. Ill. 2001), also relied on in *Vancil*, holds only that expense claims must be detailed. Again, although it is true that *Palladino* disallowed postage expenses finding that insufficient detail had been provided, *Palladino* also held that the movant bears the burden of establishing entitlement to reimbursement. *Id.* at 833-34. Contrary to the Trustee's argument, neither *ConventGuardian* nor *Palladino* holds that all that is required to support an expense reimbursement claim is detail. Rather, the detailed expenses must not be overhead and must have been actually incurred and necessary to the case administration. 11 U.S.C. §330(a)(1)(B); *In re Wildman*, 72 B.R. 700, 731 (Bankr. N.D. Ill. 1987).

In her supplemental brief, the Trustee admitted that her claimed expenses with respect to the copying and mailing of the notice of her final report were estimated rather than actual. She concedes that she charged $93.87 on her Final Report but actually only spent $51.24 because she used the BNC rather than doing the mailing herself. She also admitted at a hearing in another case when the same issue was discussed that her standard practice would be to pocket the difference between her estimated and actual expenditures under a theory that it all averages out in the end. In defense of the overcharging, the Trustee says that the UST has authorized trustees to estimate the cost of mailing bank statements to the UST and providing a stamped return envelope. She suggests that this Court should provide guidance on whether the right to estimate, which she claims the

UST has bestowed on the trustees, extends to the noticing of final reports.

Only actual expenses are reimbursable. 11 U.S.C. §330(a)(1)(B). Estimated expenses are not allowable. *Wildman*, 72 B.R. at 731. The UST has no authority to grant trustees a dispensation from the clear mandates of the Bankruptcy Code. The Trustee's practice of charging the cost of copying and mailing of final reports in-house but then using the BNC at a lower cost and pocketing the difference is wrong and constitutes a violation of her fiduciary duty to the creditors in every case where she overcharges. The Trustee admits that, when she files a final report, she knows how many pages her notice will be and how many parties will be served. Thus, she has all of the information necessary to make a firm decision on whether she will use the BNC, and there is simply no excuse for her admitted overcharging. The Trustee's overcharging in some cases is in no way mitigated by her claim that her expenses in other cases might be undercharged.

Although several of the local Chapter 7 trustees routinely charge for mailing bank statements to the UST and for providing a stamped return envelope to the UST, this Court had never considered the appropriateness of the expense until the Trustee here reported that, at least on her final reports, such expenses are estimated. Having now considered the expense, this Court finds that the mailing of bank statements to the UST is a routine postage expenditure and should be part of a trustee's overhead. Further, the expense is incurred as part of the UST's supervision of the trustees rather than as a necessary expense in the administration of any particular estate. By the time the bank statements are mailed to and reviewed by the UST, the particular case is usually closed. And the

UST's expense in mailing the bank statements back to a trustee is an expense of the UST's office for which there is no authority to charge individual estates. Although the UST can certainly require a trustee to provide a stamped envelope, the UST cannot shift costs to individual estates by doing so.

The holding of *Vancil* regarding reimbursable expenses remains the Court's position. Routine copying and mailing costs associated with sending a letter or something similar are not reimbursable; significant copying and mailing costs incurred when a document must be served on the entire mailing matrix or, at least, on a significant number of creditors or parties in interest, are reimbursable. Only costs actually incurred are reimbursable. All Chapter 7 trustees must follow the law on expense reimbursement and must make sure that the professionals they employ do likewise.

### IV. Conclusion

"Chapter 7 trustees provide valuable service to the bankruptcy system and often do so without the prospect of meaningful compensation. They only receive significant compensation when they are able to collect assets, sell property, settle causes of action, and the like." *In re Trahan*, 460 B.R. 207, 213 (Bankr. C.D. Ill. 2011). In order for Chapter 7 trustees to do their jobs and make a decent living in the process, they need to develop expertise regarding the collection and sale of assets and "know, understand, and follow the provisions of the Bankruptcy Code and Rules." *Id.*

The Court does not believe that the Trustee here acted with malice or other wrongful intent. Rather, the Trustee appeared to be overwhelmed by the case and

uninformed about the best practices that many of the trustees follow in making sales of estate property. Although the Trustee might well have appreciated the Assistant UST standing up in support of her actions in this case, the Trustee would be better served by the UST and her staff providing guidance and educational programs on the requirements of the Code and Rules and on the best practices for making sales and dealing with difficult debtors and their attorneys. Many of our local trustees have exhibited a high level of expertise in expeditiously selling assets, including unique and unusual assets, and in gaining prompt control of estate property even when that property is located in another state or in the hands of a third party. The sharing of that expertise would be of great benefit to the Trustee here and, perhaps, to other trustees as well.

The dividend that the Trustee proposes in her Final Report is small and will all be paid to the IRS on its priority claim. Requiring the Trustee to refile her Final Report would add delay and expense. Accordingly, her Final Report will be approved with the exception that her costs will be reduced from $219.44 to $176.81. The difference of $42.63 shall be included in the distribution to the IRS. The Trustee is admonished that future final reports that contain requests for expense reimbursement must conform to the requirements of the Code, Rules, and relevant case law. It they do not, the Trustee can expect that such reports will not be routinely approved and the costs, if any, of renoticing such final reports will not necessarily be passed on to the creditors through reimbursement of the Trustee.

This Opinion is to serve as Findings of Fact and Conclusions of Law

pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###